**UNITED STATES COURT OF APPEALS**
**Tenth Circuit**
**Byron White United States Courthouse**
**1823 Stout Street**
**Denver, Colorado 80294**
**(303) 844-3157**

Patrick J. Fisher, Jr.                                                                          Elisabeth A. Shumaker
Clerk                                                                                              Chief Deputy Clerk

September 1, 1999

**TO:**  ALL RECIPIENTS OF THE OPINION

**RE:**  *97-6344/97-6348, Duplan v. USA*
Filed on August 11, 1999

The opinion filed on August 11, 1999 contains a clerical error.  Please note the following correction:

On page one the section listing counsel for the plaintiffs/appellees should read as follows:

William A. Newman, Morgan & Weisbord (Les Weisbrod, Morgan & Weisbrod, and Andrew W. Lester and Shannon Davies, Lester, Loving & Davies, Edmond, Oklahoma, on brief), Dallas, Texas, for Plaintiffs-Appellees.

Please make the correction to your copy of the opinion.

Very truly yours,
Patrick Fisher, Clerk

Kathleen M. Fabrizio
Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 11 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ROSEANNE DUPLAN, an individual
and next friend of Zachary Duplan, a
minor; MICHAEL DUPLAN, an
individual; ZACHARY DUPLAN, a
minor by his next friend Roseanne
Duplan,

      Plaintiffs - Appellees and
      Cross-Appellants,

    v.

CLIO HARPER, an individual; VINAY
BHOPLAY, an individual; TERESA
GERLICH, an individual; FRANCIS L.
PERRY; MED-NATIONAL INC.,

      Defendants - Appellees,

UNITED STATES OF AMERICA,

      Defendant - Appellant and
      Cross-Appellee,

    and

SHARON H. BAKER, MAJOR US
AIR FORCE, an individual;
ELIZABETH REED, an individual;
CARRIE R. HANCOCK, an individual;
N. SUZANNE FISHER, an individual,

      Defendants.

Nos. 97-6344
& 97-6348

Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 95-CV-216 and D.C. No. 96-CV-2004)

Edward Himmelfarb (Robert S. Greenspan and Marc Richman on brief), United States Department of Justice, Washington, D.C., for Defendant-Appellant.

William A. Newman, Morgan & Weisbord (Les Weisbrod, Morgan & Weisbrod, and Andrew W. Lester and Shannon Davies, Lester, Loving & Davies, Edmond, Oklahoma, on brief), Dallas, Texas, for Plaintiffs-Appellees.

Hilton H. Walters (John M. Perry III on brief), Perry, Rife, Walters, Sullivan & Cain, Oklahoma City, Oklahoma, for Intervenor.

Before **SEYMOUR, MAGILL,**[*] and **EBEL,** Circuit Judges.

**MAGILL,** Circuit Judge.

This appeal concerns a wrongful birth, medical malpractice action brought by Michael and Roseanne Duplan under the Federal Tort Claims Act for treatment provided to Mrs. Duplan at an Air Force clinic. The district court, after a bench trial, found in favor of the Duplans and awarded them more than $3 million in damages. The United States appeals the district court's determinations that (1) Dr. Clio Harper, the contract doctor who treated Mrs. Duplan, was a

---

[*]Honorable Frank Magill, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

governmental employee and (2) the court was without power to impose a trust for the benefit of the Duplans' child, Zachary, on a portion of the damages awarded. The Duplans cross-appeal, arguing that the damages awarded by the district court were insufficient. Dr. Harper moved to intervene on appeal. We affirm in part, reverse in part, and remand for further proceedings.

## I.

In June 1992 Roseanne Duplan went to the OB/GYN clinic (the Clinic) at Tinker Air Force Base (Tinker) to obtain a pregnancy test. She learned that she was pregnant. Because her job environment put her at increased risk of becoming infected with cytomegalovirus (CMV), which can cause birth defects, Mrs. Duplan wished to be tested to determine whether she was immune to CMV. Mrs. Duplan and her husband, Michael Duplan, agreed to abort the pregnancy if she was not immune rather than take the risk of having a child with CMV-induced birth defects.

On July 22, 1992, Dr. Harper, a physician who worked at the Clinic, examined Mrs. Duplan. Dr. Harper was an employee of Med-National, Inc., which had contracted with the United States Air Force to provide medical services at Tinker. Mrs. Duplan took the CMV test, and the test results indicated that Mrs. Duplan had an ongoing primary CMV infection, which posed a significant risk of

severe birth defects. Dr. Harper instructed Nurse Elizabeth Reed, an Air Force employee, to notify Mrs. Duplan of the results of the CMV test.

Reed contacted Mrs. Duplan by phone and told her that the results of the CMV test were positive. Mrs. Duplan was uncertain whether a positive result meant that she was immune to CMV or that she was infected, so she called Reed back and asked her for clarification of the test results. Reed incorrectly told Mrs. Duplan that a positive test result meant that Mrs. Duplan was immune to CMV. Based on this erroneous information, Mrs. Duplan decided not to abort the pregnancy.

Mrs. Duplan gave birth to a son, Zachary, who was born with CMV-induced birth defects including hearing loss, delay in development and loss of certain fine and gross motor skills, mental retardation, microcephaly, and nystagmus. Zachary will require custodial care throughout his life and will need significant medical care and rehabilitative special education to function independently in any meaningful way.

On January 10, 1995, the Duplans filed suit in Oklahoma state court, claiming that various doctors and nurses, in their individual capacities, were negligent in their medical treatment of Mrs. Duplan at Tinker. The government certified that the medical providers employed by the government (including Reed but not including contract employees such as Dr. Harper) were acting within the

scope of their employment and removed the case to federal district court pursuant to 28 U.S.C. § 1442(a)(1). On January 12, 1995, the Duplans filed a Notice of Claim with the Air Force, invoking the Federal Tort Claims Act (FTCA). On March 27, 1995, the government filed a motion to dismiss the Duplans' federal action because the Duplans failed to exhaust their administrative remedies before filing suit. Rather than dismiss the Duplans' complaint, the district court, with the agreement of the parties, administratively closed the case pending the resolution of the administrative process.

The Duplans received notice on July 25, 1995, that the Air Force had denied their administrative claims. On August 21, 1995, the district court reopened the Duplans' case. Two days later the Duplans filed an amended complaint adding the United States as a defendant.

On August 22, 1996, the district court considered whether the medical personnel defendants were governmental employees for purposes of FTCA liability. It concluded that the contract doctor defendants were government employees and, thus, that the government could be liable for their conduct under the FTCA. Accordingly, the district court dismissed the contract doctor defendants, including Dr. Harper, and granted summary judgment to Med-National, leaving the United States as the sole defendant.

The Duplans filed a second amended complaint on September 10, 1996. The government filed another motion to dismiss the Duplans' case, asserting that their filing of an amended complaint after the exhaustion of administrative remedies did not cure the jurisdictional defect created by their failure to exhaust prior to filing the original complaint. The court denied the government's motion.

On November 29, 1996, the Duplans commenced a new action against the United States, filing a complaint essentially similar to the second amended complaint filed in the first case. The government filed a motion to dismiss the second action on the ground that the Duplans' claims were untimely made. The district court denied the government's motion and subsequently consolidated the first and second actions.

After a bench trial, the district court concluded that Dr. Harper and Reed had acted negligently with respect to their treatment of Mrs. Duplan and found the United States liable for this negligence. The district court awarded the Duplans $3,056,100 in damages—$200,000 for their emotional distress and $2,856,100 for the extraordinary costs of Zachary's care. The district court concluded that it was without power to impose a trust for the benefit of Zachary as part of the judgment.

On appeal the government argues that the district court erred in concluding (1) Dr. Harper was a de facto employee of the government and (2) it was without

power to impose a trust for the benefit of Zachary. The Duplans cross-appeal, arguing the damages the district court awarded them are inadequate. Dr. Harper brought a motion to intervene on appeal, seeking to address the district court's conclusions that (1) it had subject matter jurisdiction over the Duplans' first and second actions; (2) Dr. Harper was a governmental employee, not an independent contractor; and (3) Dr. Harper was negligent with respect to his treatment of Mrs. Duplan. We provisionally granted Dr. Harper's motion.

## II.

We first address the question of whether the district court had subject matter jurisdiction over the Duplans' FTCA claim. It is well established that this Court must sua sponte "satisfy itself of its power to adjudicate in every case." Tafoya v. DOJ, 748 F.2d 1389, 1390 (10th Cir. 1984).

As a jurisdictional prerequisite, the FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies. See 28 U.S.C. § 2675(a); McNeil v. United States, 508 U.S. 106, 113 (1993) (holding "FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies"); Pipkin v. USPS, 951 F.2d 272, 273 (10th Cir. 1991) (holding exhaustion of administrative claims is jurisdictional prerequisite to asserting claims under FTCA). The Duplans do not dispute that

they filed their original complaint in the first action before exhausting their administrative remedies, but they contend that their subsequent amended complaint cured any jurisdictional deficiency created by the premature filing of the original complaint.

The only court to consider the question of whether an amended complaint filed after exhaustion can cure a prematurely filed original complaint, in light of McNeil, concluded that it cannot. See Sparrow v. USPS, 825 F. Supp. 252, 254-55 (E.D. Cal. 1993). But cf. Filaski v. United States, 776 F. Supp. 115, 118 (E.D.N.Y. 1991) (granting motion to dismiss for lack of subject matter jurisdiction but allowing plaintiff to serve amended complaint "and thereby restore the action"). We agree with the Sparrow court's conclusion that, as a general rule, a premature "complaint cannot be cured through amendment, but instead, plaintiff must file a new suit." Sparrow, 825 F. Supp. at 255. Allowing claimants generally to bring suit under the FTCA before exhausting their administrative remedies and to cure the jurisdictional defect by filing an amended complaint would render the exhaustion requirement meaningless and impose an unnecessary burden on the judicial system. See McNeil, 508 U.S. at 112; Sparrow, 825 F. Supp. at 255. "Congress intended to require complete exhaustion . . . before invocation of the judicial process." McNeil, 508 U.S. at 112.

However, in this case the government agreed that the amended complaint effectively constituted a new action and agreed to administrative closure of the first action pending exhaustion.  See Mem. Op. and Order of October 30, 1996, at 2, 4-5.  That is, the Duplans' filing of the amended complaint was treated by the parties and the court as the institution of a new suit against the government.  Cf. McNeil, 508 U.S. at 110 n.5, 113 n.9 (implying that new action may in certain circumstances be instituted by document other than new complaint); Hyatt v. United States, 968 F. Supp. 96, 99-100 (E.D.N.Y. 1997) (implicitly acknowledging that filing of amended complaint may in certain circumstances be sufficient to institute new action); Ellis v. Hanson Natural Resources Co., 857 F. Supp. 766, 771 (D. Or. 1994) (implying that filing of amended complaint may in certain circumstances be sufficient to institute new action), aff'd, 70 F.3d 1278 (9th Cir. 1995) (unpublished).  Because the government expressly agreed to the procedure employed by the district court, the filing of the amended complaint was properly construed as instituting a new action against the government.  Since the Duplans exhausted their administrative remedies before filing this amended complaint, the district court had subject matter jurisdiction over the Duplans' FTCA claim.

**III.**

The government argues that the district court erred in concluding that Dr.

Harper was a governmental employee rather than an independent contractor. We

review this question of law de novo. See Lilly v. Fieldstone, 876 F.2d 857, 858

(10th Cir. 1989).

In determining whether an individual is a federal employee or an

independent contractor, the critical question is whether the federal government

has the power to control the detailed physical performance of the individual. See

id. We have held that the key inquiry under this control test is "whether the

Government supervises the day-to-day operations of the individual." Id.

(quotation marks omitted). This inquiry involves consideration of a number of

factors, including the intent of parties, the allocation of insurance obligations, and

whether the government in fact controlled only the end result of Dr. Harper's

efforts or also controlled the manner and method in which Dr. Harper conducted

his activities. See id. at 859.

The intent of the parties was to establish an independent contractor

relationship. The contracts between the government and Med-National (Med-

National contract) on one hand and Med-National and Dr. Harper (Harper

contract) on the other hand explicitly identify Med-National and Dr. Harper,

respectively, as independent contractors. The Med-National contract provided

that Med-National had the responsibility of selection, assignment, reassignment,

transfer, supervision, management, and control of contract doctors, see Med-National Contract § C-1.2.2.3, and was required to appoint a contract doctor to act as Chief of OB/GYN services who would exercise "direct supervisory authority" over the other contract doctors.  Id. at § C-5.2.  When working at the hospital, Dr. Harper was required to wear a name tag that identified him as a "CONTRACT PHYSICIAN."  Id. at § C-5.10.1.  Dr. Harper was paid directly by Med-National; he was not on the government payroll.  These facts reflect the parties' intent to delegate to Med-National day-to-day supervisory responsibilities and to distinguish between contract doctors (like Dr. Harper) and governmental employees (like Reed).

Under the Med-National contract, Med-National was obligated to carry $3 million of its own medical liability insurance, workers' compensation insurance, and general liability insurance.  Under the Harper contract, Dr. Harper was obligated to provide his own medical liability insurance.  That both Med-National and Dr. Harper were required to obtain their own liability insurance further supports a finding that both were acting as independent contractors.  See Lurch v. United States, 719 F.2d 333, 338 (10th Cir. 1983) (holding medical contractor's providing own workers' compensation and other insurance supports finding of independent contractor, not employer-employee, relationship).

-11-

Despite these facts supporting the conclusion that Dr. Harper was an independent contractor, the district court determined that Dr. Harper was, in fact, an employee of the government. It opined that the contractual evidence of delegation of control and insurance coverage was outweighed by the following facts: patient records were maintained by and controlled by the government; the government retained the power to conduct periodic quality reviews of the doctors' performance; the government imposed minimum standards for doctors hired to perform services under its contract with Med-National with respect to education, licensing, work experience, and general health; the government required doctors to abide by a dress code; the government required doctors to follow government-established rules, policies, and procedures in treating patients at the Clinic; the government supplied virtually all equipment and support personnel at the Clinic; and the government required that Dr. Harper be at the Clinic during designated hours. We are not convinced that all of these facts support the conclusion that Dr. Harper was a governmental employee rather than an independent contractor.

With respect to the government's control over patient records, we believe the relevant provisions in the Med-National contract do not weigh heavily in favor of finding that Dr. Harper is a governmental employee. While these provisions restrict Dr. Harper's ability to disseminate patient lists and medical

-12-

information outside Tinker, they do not substantively restrict Dr. Harper's use of this information in the performance of his duties. Cf. Robb v. United States, 80 F.3d 884, 894 (4th Cir. 1996) (concluding that doctor was independent contractor, not governmental employee, despite contract provision requiring him to return all films and examinations to government facility where they would remain property of and be subject to exclusive control of government). Similarly, the government's ability to require that contract doctors meet minimum qualifications and to conduct reviews of the contract doctors' performance "amounts to nothing more than a standard quality assurance [provision] by which the government reserves the right to determine whether it is satisfied with the services it is purchasing under the contract." Id. at 892; see also Curry v. United States, 97 F.3d 412, 415 (10th Cir. 1996) ("[T]he right of the government to inspect work for compliance with a contract does not automatically make the worker an employee.").

There was no evidence showing that the Clinic's regulations and dress code diminished Dr. Harper's control over the choices he made in fulfilling his duties.[1]

---

[1]In concluding that Dr. Harper was a governmental employee, the district court predicated its decision primarily on one regulation, a "gag rule," which prohibited Dr. Harper from discussing abortion with his patients. The "gag rule" applied to all employees and contract doctors at Tinker during the time period at issue. Indeed, any grantee of federal funds under Title X of the Public Health Service Act, 42 U.S.C. §§ 300 to 300a-6, was obligated to honor the restrictions contained in the
(continued...)

As we held in Lilly, "[s]urely, being subject to [a] hospital's rules as a condition of staff privileges does not remotely make a private physician an employee of that hospital." 876 F.2d at 860. Likewise, that Dr. Harper was subject to the government's rules as a condition of working at the Clinic does not indicate that he was an employee of the government.

We are left, then, with the requirement that Dr. Harper be at the Clinic during designated hours, the government's provision of equipment and office space, and the government's control over patient records as the sole facts weighing in favor of finding Dr. Harper an employee of the government. Even when viewed together, these particulars are insufficient to demonstrate government control over Dr. Harper's "detailed physical performance" when balanced against the delineation of responsibility and insurance liability set forth in the contracts and other facts supporting the conclusion that Dr. Harper was an independent contractor. See id. (stating control determination is conducted by

---

[1](...continued)
"gag rule." However, the "gag rule" reflected a decision by Tinker not to provide certain medical services (namely, family planning advice regarding abortion), not an attempt to supervise the day-to-day operations of Dr. Harper. It appears that Dr. Harper retained the same control over the choices he made in his treatment of patients that he would have had at a private, religious hospital, or at any other Title X grantee. Therefore, subjecting Dr. Harper to the "gag rule" did not transform him into a governmental employee. See Lilly, 876 F.2d at 860.

balancing competing factors).  We therefore reverse the district court's conclusion

that Dr. Harper was a governmental employee.[2]

## IV.

The government last argues that the district court erred in failing to impose

a trust on the $2,856,100 in damages awarded to the Duplans to cover the

extraordinary costs of Zachary's care.  While the district court believed that a trust

arrangement was of vital importance to the case, it concluded that it did not have

the power to impose a trust.  As the government correctly notes, we have held that

district courts have inherent authority to impose a trust as part of a judgment in

FTCA cases.  See Hull v. United States, 971 F.2d 1499, 1504-05 (10th Cir. 1992);

see also Deasy v. United States, 99 F.3d 354, 360 (10th Cir. 1996); Hill v. United

States, 81 F.3d 118, 121 (10th Cir. 1996).  But the fact that district courts

generally have such authority does not end our inquiry.  Rather, we must

---

[2]We reject the government's argument that, in light of our conclusion, we must remand to the district court for a new trial to apportion liability between Dr. Harper and the government.  The government admits that it could be made to pay the entire judgment because Dr. Harper and Reed are jointly and severally liable.  The government did not bring a cross-claim against Dr. Harper prior to the district court's determination that Dr. Harper was a governmental employee, and the resolution of this dispute does not affect the rights of the Duplans with respect to the damages award.  The government may seek indemnity or contribution from Dr. Harper in subsequent litigation, or the district court in its discretion may choose to resolve the issue on remand.  See Part VII, infra.

determine whether imposition of a trust in the instant case would have been appropriate.

An action for wrongful birth is designed to compensate the parents, not the child. See Liddington v. Burns, 916 F. Supp. 1127, 1132 (W.D. Okla. 1995) (noting that wrongful birth action is designed to compensate parent plaintiffs for "being deprived of the option of . . . making an informed and meaningful decision either to terminate the pregnancy or to give birth to a potentially defective child"); see also W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 55 at 370 (5th ed. 1984) (stating that wrongful birth claims are brought by parents to recover their own damages). Unlike the situations presented in Hull, Hill, and Deasy, Zachary is not the true plaintiff in this case. While the $2,856,100 portion of the damages award may benefit Zachary, it is not compensation to him for any injury he has suffered. The damages belong to the true plaintiffs, the Duplans, and the district court would have erred in imposing a trust on this award in the absence of their consent.

## V.

The Duplans argue in their cross-appeal that the district court erred in calculating the damages for the Duplans' emotional distress and for the extraordinary costs of Zachary's care. We will uphold the district court's findings

concerning the appropriate amount of damages unless they are clearly erroneous. See Deasy, 99 F.3d at 359.

## A. Damages to compensate for costs of Zachary's care

The district court awarded $2,856,100 to the Duplans to compensate them for the extraordinary costs of Zachary's care. Contending that this amount is insufficient, the Duplans argue that because they presented uncontradicted expert testimony regarding the costs of Zachary's care due to the CMV-related defects, the district court was obligated to accept this testimony. The Duplans ignore the fact that when the district court acts as fact finder it is not obliged to accept uncontradicted expert testimony. See Neece v. IRS, 41 F.3d 1396, 1399 (10th Cir. 1994) ("Any determination of the credibility of a witness necessarily includes the right of the fact finder to disbelieve the witness.").

Though the government did not present evidence to contradict the testimony of Lawrence Forman, the Duplans' expert, portions of his testimony were unsupported, inconsistent with the testimony of the Duplans' other witnesses, or vague. Forman presented to the district court four models that estimated the costs of Zachary's lifetime care. Each of the models was comprised of a number of services and goods that Zachary would need, given certain assumptions regarding his development. Forman opined that Zachary would benefit most from one specific model (which was not the least expensive) but did

not provide a basis for this assertion. Forman also included in his models the costs of providing certain services or goods without demonstrating Zachary's need for them. For example, Forman included the cost of providing Zachary with a wheelchair from his present age until age eighteen. However, Michael Duplan testified that Zachary neither had nor needed the use of a wheelchair. Additionally, Forman estimated the expenses of certain services included in his models as a range of values. Yet, in calculating the overall costs for the models, Forman did not disclose to the district court what value within the range he had used as the basis for his calculation or the reason why he had chosen that value. The district court did not err in choosing not to credit these and other deficient elements of Forman's damages testimony.

### B. Damages to compensate for emotional distress

The district court awarded $200,000 to the Duplans for their emotional distress. The Duplans contend that this amount is insufficient, though they provide no legal or factual support for their position. Because, as the Duplans concede, the injury in a wrongful birth case is the loss of the right to decide whether to have a child who potentially may suffer birth defects, see Liddington, 916 F. Supp. at 1142, they may receive damages for emotional distress only to the extent they suffered due to the loss of this right. Nothing in the record leads us to believe the district court erred in parsing the Duplans' alleged manifestations of

emotional distress to ascertain that portion attributable solely to the loss of the right to decide whether to have Zachary or to abort him. Therefore, we cannot say the district court erred in awarding $200,000 to the Duplans for their emotional distress.

## VI.

We affirm our provisional granting of Dr. Harper's motion to intervene on appeal with respect to the issues of subject matter jurisdiction, which we must address sua sponte, and Dr. Harper's status as employee or independent contractor, which the government raised on appeal. We deny the motion to intervene on appeal with respect to the issue of Dr. Harper's negligence, which was not raised on appeal and which Dr. Harper did not seek to present in the district court.[3] See Spring Constr. Co. v. Harris, 614 F.2d 374, 377 n.1 (4th Cir. 1980) (noting, "most cases have held that intervention on appeal will be granted only under exceptional circumstances"); McKenna v. Pan Am. Petroleum Corp., 303 F.2d 778, 779 (5th Cir. 1962) (per curiam) ("A court of appeals may, but only

---

[3]In deciding how to proceed on remand, see Part VII, infra, the district court should give consideration to the facts that Dr. Harper was represented by the government at trial and that the government did not appeal the district court's finding that Dr. Harper was negligent.

in an exceptional case for imperative reasons, permit intervention where none was sought in the district court . . . .").

## VII.

We conclude that the district court had subject matter jurisdiction over the Duplans' FTCA claim against the government. We reverse the district court's determination that Dr. Harper was an employee, not an independent contractor, of the government, and we affirm the district court's damages award. We remand to the district court for further proceedings consistent with our opinion.